This honorable court is again in session. Be seated. Case number 18-1167, Sierra Club Petitioner v. Environmental Protection Agency, et al. Mr. Summers for the petitioner, Mr. Ling for the response. Good morning, your honors. Gordon Summers for petitioner. I'd like to reserve four minutes for rebuttal, please. May it please the court. We're here today because EPA has authorized permitting authorities around the country to grant permits, grant construction permits to new and modified major sources that will cause violations of the National Ambient Air Quality Standards. This morning, I'd like to make three points as to why that is illegal. The first is that this Court has held in the Alabama Power case that the National Ambient Air Quality Standards and the increments are thresholds that are not to be exceeded. Can we deal with finality first? Why is this final agency action? And particularly, what legal effect does this memorandum have? Absolutely, your honor. This case is very much like the Scenic America case that this Court decided in 2016. The guidance that EPA has put forth states EPA's definitive legal interpretation that authorizes permitting authorities to grant permits that otherwise they could not grant. And so it allows facilities to be built that otherwise would need to reduce their emissions. Where does EPA bind even itself? Because you can see that they don't bind the states, right? Well, there are rules that constrain or withdraw discretion, your honor, and there are rules that grant discretion. The Clean Air Act doesn't give discretion to permitting authorities to grant permits in what EPA considers de minimis circumstances. It says simply that they must demonstrate that they will not cause or contribute to a violation. EPA's legal memorandum that they've attached and the guidance itself state unequivocally that EPA has interpreted the act such that permitting authorities can now exercise discretion and grant permits in these situations. And this is EPA's last word in the process because it's not EPA, except in certain states where they're administering the program. Generally speaking, this is states that now will take this authority and, in fact, are taking this authority to grant permits. Are there Federal implementation plans now in effect? There are several states where EPA administers the PSD program, yes, your honor. But in most cases, it's states administering this. Well, I understand that. And so there's no guarantee that review would end up back before this Court, because under the PSD program, after a State grants a permit, appeal generally goes to the State courts of appeal or the State tribunals and then review even the State implementation plan, not necessarily the Federal law itself. What about if EPA approves? If EPA approves, it could get back to this Court or to the regional court where this occurs. And if you look at citing references for these statutes, there are very few instances where PSD appeals have ever made it before this Court, in fact, because it generally does not occur that way. Typically, you would end up with a number of different State interpretations around the country as to how State plans do or do not support this. But I should add that many of those State tribunals actually give a great amount of deference to EPA's interpretation of the statute. And again, here, EPA has stated that interpretation. But again, on the EPA, where EPA has to approve the permits? No, your honor. There's no place? EPA doesn't have to approve any permits? Only in a handful of states, your honor, where EPA is administering the program. And in that case, it's the EPA region that's doing it. But generally, it's States that are doing it. I understand that. But in those cases, those could be appealed to Federal court. I believe that's right, your honor. It would go to the regional court of appeals, not necessarily to this circuit, though. Wait. If a State permitting authority denies a permit, the company has to go to, well, it exhausts its administrative remedies. But then it goes into State court, doesn't it? Yes, your honor. Where the State is implementing the PSD program, that's right. I believe Judge Garland is asking about in States where EPA is administering the program there, it would go to the environmental appeals board. Oh, okay. Okay. Yeah. Can the company in the hypothetical challenging the denial of a permit, can they raise questions about the guidance, the EPA's guidance? They could, your honor. And then typically States would, State courts would give great deference to EPA's guidance. And moreover, it wouldn't bind EPA around the country when those State courts decided. Does that not apply to State courts? Well, your honor, that's a very good question, your honor, because EPA is trying to have it both ways here. They purport to be filling a gap in the statute, seemingly under that authority, but they're delegating that task to States who I'm not aware of any precedent that States have such discretion. That's one reason I believe that EPA's statement here, where they purport to be definitively filling this gap, has legal effect. Because this is EPA's last word in the process, and subsequent to that, States will be, and in fact are, applying that interpretation to grant permits. What's the difference between the guidance here with respect to particulate matter and 24-hour standard, and the guidance that was issued in 2014? I believe the 24- On particulate matter. So one of the key differences here, your honor, is that this is an entirely new rationale for significant impact levels that EPA has never before promulgated in this fashion. But the SIR, whatever you call it, SIL, is the same as it was in 2014, isn't it? The difference, your honor, the only codified SILs are the ones in the Federal Regulation, or in the Code of Federal Regulations, which only dictate when a source's impact is significant, not when it is not significant. It's true that sources around the country have been using SILs for a long time, and EPA has been trying very hard to find a legal rationale. They tried in 1996, withdrew that. They tried in 2010, and then admitted to this Court that because it required granting permits to sources that would cause violations, it was illegal. So the argument is that if it's not significant under the CFR, that doesn't mean it's insignificant. That's right, your honor. It only says in the CFR, these are cases where these impacts are significant if they're above these levels. But, yes, they've been trying this for years, but it really just won't write. The statute does not support that interpretation. It's a very clear right-line standard under the statute. These facilities must demonstrate they will not cause or contribute to a violation. And EPA here doesn't even contest that sources availing themselves of these SILs can and may well be the but-for cause of a violation, yet permitting authorities under EPA's interpretation of the statute would have full discretion to grant a permit. Additionally Can you say how what you just said interrelates or relates to their position that they're not saying that they're allowing an insignificant amount. They're saying that they're allowing an amount that they can't tell, that appears statistically insignificant and, therefore, is not distinguishable from random. Your honor, EPA, I believe, used the swimming pool analogy in their brief for this. And the fact is these impacts are additive. EPA's variability approach looks at the weather patterns and other natural phenomena that make air pollution go up and down in regions. And then they have, in these cases, for these permits, they have very concrete modeling that they admit is extremely accurate that shows these sources will have an impact so significant that it changes the ambient level as measured by EPA's design value approach. So I thought, or maybe it's a consequence of the briefs, I thought that they were saying they couldn't tell whether the design value has been actually changed or just a randomness of measurement. No, your honor, they admit that these sources will have impacts that do change the design value. Well, the problem, though, is with these two, with ozone in particular matter, that the problem that EPA has identified for a long time is that neither one is issued or emitted into the atmosphere or into the air. They result from a combination of chemicals that, you know, whatever, I forget, nitrogen oxides and volatile organic compounds. And so if you have a single source emitting nitrogen oxides, for example, it's very difficult to measure and determine that that source is responsible. This gets back to Judge Garland's question, that that source is responsible for an increase in ozone. And it may be just because, you know, ozone cooks and we just had a very hot summer or we had low temperatures or high temperatures in the evenings or, you know, a thousand other things. There's two points in response to that, your honor. The first is that EPA admits that the modeling for these sources would show very clearly that there is, in fact, a contribution that may well even be the cause of a violation. There's no question here that the modeling is very accurate and shows a real impact from these sources. The second point, your honor, is that EPA would have the statute allow for some kind of culpability analysis. And that's exactly what the statute forecloses. Congress used the word cause and added or contributed specifically to get away from these questions of who's at fault. The point of the statute, as this Court has explained in Alabama Power, is to prevent any exceedance whatsoever of these standards to protect areas designated as an attainment. And so it doesn't really matter under Congress's framework whose fault the violation is. If modeling shows a new source through its NOx emissions or whatever is going to contribute in some way to a violation exacerbating that problem, here the statute would require them to reduce their emissions or use some other method, perhaps offsetting, before worsening that violation. Roberts. You would agree, though, that we're talking about whether to grant a permit or not for the building or the modification of the facility that emits the precursors to a particular matter or ozone, right? Yes. But would you agree that a State permitting authority would be able to or could grant permits and the upshot would be that it wouldn't result in a violation of the NOx? If the modeling showed it would not cause or contribute to a violation, yes, they could. So it can be applied in a manner that doesn't violate the national ambient air quality standard? Not the SILs, Your Honor, because the problem is Every time? It's not every time, Your Honor. It's one of these things where there are certain questions you can only answer knowing certain information. So if Your Honor asked me for directions somewhere, I'd have to know where you were starting from. Okay. Let me reframe it. Is it your position that every time a State grants a permit to a facility that measures the it emits less than the significant impact level? Every time a State grants a permit to that kind of a power plant or whatever, it's a violation of the NOx? It's a violation of 747583 because they have not shown it won't violate the NOx. And there are cases where it will violate the NOx, but it depends on what the current air quality is. It depends. Yes. It depends. Okay. I'd like to say one more thing, actually, Judge Wilkins, in response to your question about finality, which is to mention that also the NRDC case that we cited in our briefs illustrates another way in which this binds EPA. EPA has an oversight role under the PSD program, and the effect of this definitive statement is that they've now withdrawn their own ability to exercise that oversight enforcement action, for instance, against a PSD permit granted by a State relying on this. How have they precisely withdrawn their enforcement authority or limited their enforcement authority? Well, by taking a definitive interpretation of the statute, they could enforce under another, you know, for another rationale, for instance, but they'd be doing a complete 180 with their own definitive interpretation if they vacated a permit granted on this rationale on the basis that it was granted because the statute allowed it. What authority do you have for that other than just, you know, you're saying that they would be? Well, that's exactly what occurred in the Scenic America and the NRDC cases, Your Honor, is that effectively the State federal agency's position effectively created a safe harbor for permitting authorities or for the States to take a certain action because the EPA had said, this is lawful and we want you to do this. And it's different than any situation where, for instance, the EPA is just forecasting a future interpretation that it will take in its own decision making. Here, they're telling somebody else, you have authority to do this and we won't stop you. That is legal effect. Our members, my client's members, Your Honor, are going to be breathing pollution that violates these standards because of the permits granted under this authority. Unless this panel has further questions. The amounts we're talking about, I don't know that you can trace that to any particular injury to your the members of the Sierra Club, but I assume that's the case. Nevertheless, what, I have two questions. One is why shouldn't we treat this as analogous to a notice of proposed rulemaking without a deadline order? The EPA wants to gather information on a space that seems like a plausible rationale for putting this out without making it binding. And they want to see what the experience will lead to. If they just promulgated this as a regulation, then instead of 5.0, their evidence that comes in indicates that it should be lower. I said 4.1. That means they have to go through another entire rulemaking. So that really makes absolutely no sense whatsoever. Why don't you answer that? Sure. I think the best way to illustrate it, Your Honor, I should clarify that we're not challenging that the number is just, you know, a little too high or a little too low. It's the fact that they have a number at all. The most clearly final part of all of this is that EPA has taken this definitive interpretation of the statute that creates discretion. It's sort of a two-step process. They've created this discretion, and then they're suggesting an approach, which is an arbitrary approach, but they're suggesting then an approach for how to implement that discretion. And this is, you might look at the cement cones case that this Court decided, where the agency had a rule that created discretion and had legal effect in that way and then had a guidance to suggest how to implement that. This, they sort of, you know, skipped past the rulemaking stage entirely and created discretion from whole cloth that doesn't exist under the statute. And they just can't do that in a guidance document. It has effect all around the country. These permits are being granted in reliance on this interpretation. Is the discretionary aspect of this written into a state implementation plan with respect to the granting of permits? I'm not sure about any particular state plan, but I want to clarify that the discretion is a bit of a red herring here because there are rules all the time that have legal effect by conveying, creating discretion for somebody to do something. This Court, when it accepted EPA's request for a remand in the 2013 Sierra Club case, the issue there was that EPA admitted that by requiring the granting, in that case, of permits that violated the statute, it was violating the law. It's really no different when they've now authorized the granting of those same permits that violate the law. Whether or not permitting authorities have, you know, something akin to like an enforcement discretion where they don't have to, they can throw up their hands and not grant the permit, but EPA has authorized them to grant the permit. Is there such a thing in your view as something that has no significant impact? Hypothetically, Your Honor, you could, again, if you consider the necessary information, so if you looked at a region that you knew was, you know, 10 parts per million away from a standard, you knew there was nothing else getting built, and you knew the contribution of that source was going to be, you know, one part per million, you could say, yeah, that won't cause a violation. But the statute requires not that you show it won't be, you know, a significant violation. You must show there is not going to be a violation of the standard. EPA doesn't even contend in its legal memorandum that you can have sources built under this that are the but-for cause of violations. And, in fact, that's the intent of this entire guidance. They say at JA-11, Your Honor, that part of their goal with this entirely new legal rationale was to allow for sales that can be used even in situations where the maximum increment are known to be nearly consumed. And at JA-19, they specifically authorize using them in what they call a culpability analysis, where it's shown that the source will be a cause or a contributor to a violation, and EPA says permitting authorities can grant the permit anyway. I see I've passed my time, so I'll sit down.  Thank you. Good morning, Your Honors. My name is Brian Link, and with me at council table is Mark Kataoka from EPA. The guidance memorandum for significant impact levels at issue in this case carried forward EPA's ongoing efforts in response to the concerns of Sierra Club and others to facilitate the modeling of proposed PSD sources precursor permitting missions. The guidance explains a new legal rationale and technical justification for significant impact levels, which had already been used in PSD implementation for decades.  Sure, Your Honor. Which had already been used in PSD implementation for decades prior to this guidance. But the guidance only recommends the justifications it provides. It only recommends the values. It does not mandate them. It does not require their use. The court should dismiss this petition because the petitioner has not met its burden of establishing jurisdiction. It has not shown that the guidance is a final action under the test and benefit or that the issues it seeks to present are fit for review here as opposed to in the context of a specific permitting application decision that may apply the guidance. To be considered final, agency action must meet two criteria under Bennett. It must mark the conclusion of the decision-making process and must have a direct and appreciable legal consequence. And both prongs of this test must be satisfied independently or the guidance is a non-final action. Here, at minimum, the guidance clearly fails to meet the second prong of Bennett because it does not impose any direct legal consequences. Just so we're clear, are you conceding the first prong? We're not conceding the first prong. EPA described its process, and Judge Randolph referred to that accurately, as one in which it would await the development of more information. Assuming that some permitting authorities would apply this guidance, it would be able to have a better understanding of whether the values it was proposing were suitable for all instances or not based on the results of those case-by-case permitting decisions. And at this point, that proposed rulemaking or anticipated rulemaking is still identified on its regulatory agenda. So the process isn't finished for purposes of prong one, but I would say that where the petitioners most fail to meet Bennett is under prong two. This entire document is written in the form of a set of non-binding recommendations. It does not command, as did the guidance in the Appalachian Power case, for example. It does not give two options with no discretion to do something else, as did the guidance in the NRDC case that counsel just talked about. Here, everything is written in the form of suggestion and encouragement, but EPA makes very clear that states can choose their own approach, they could ignore this guidance, and there's no sanction for that. They could use SILs but come up with a different, lower value, and there's no sanction for that. They could use a higher value if they can justify it based on the record and as consistent with the statute. Your friend on the other side, though, says that there is legal effect because it, in effect, creates a safe harbor that wasn't there before. I don't, I think that that is not quite right, because for one thing, the approach that the petitioners would have EPA take, and then the one that they are saying is lost here, is an approach that would assume any impact, any projected emissions whatsoever from a source automatically are deemed to cause or contribute. EPA has never in 40 years interpreted the statute that way in any of its guidance, even before this document, and as we argued in the brief, in fact, that reading really would reflect the language that Congress used in the nonattainment NSR provisions, where the statute simply doesn't say will not cause or contribute, it says you have to offset any emissions from the source. So there's no sort of new change in the legal regime in that sense. And I think it's important to note that EPA didn't have the position petitioners are arguing for. All they've done here is provide a different explanation and a better statistical foundation for that approach and a type of screening tool that they were already encouraging the use of prior to this guidance. Sotomayor How does the, how would EPA enforce a rule against a State permitting authority? Does EPA review the grant of permit, of a permit? There's not a mechanism in the Clean Air Act for automatic EPA review of PSD permits. It is primarily a State implemented program. EPA does have the authority to issue stop construction notices if it were to determine that that were warranted. And obviously I can't speculate about when and where they would do that. But certainly in this guidance they've made clear that while they recommend and encourage that these SILs should be sufficient in most circumstances, that there may be cases where more analysis is needed and it's up to the permitting authority to fulfill its responsibility. See, all this leads to it, I'm going to try to keep this as simple as possible, but let's suppose that the guidance is upheld and a State permitting authority takes a look at it and says, well, I think EPA did a lot of studies here. We're going to use their SIL. And the projections are that this particular plan is going to emit less than the SIL. Therefore, we're granting the permit. And a citizen suit provision is in the State implementation plan. And a suit is brought against the State permitting authority. And that suit would wind up if it's, say it's in Maryland, in Bethesda, would wind up in the Montgomery County Circuit Court who would be charged with deciding whether the statute, the cause or contribute portion of it, allows the use of an SIL that way. That seems really odd that it would have to, it would go to a circuit or a county court and then go up to the Maryland Court of Special Appeals and then ultimately the Court of Appeals of Maryland. Is that the way it goes? It is in most circumstances. And to be clear, in all of the States that have an approved SIP with PSD provisions, yes, it would go to State court. If it is a State with a delegated Federal program or if it's EPA implementing the Federal program directly, then it would go to the Environmental Field Board or I wouldn't say that that's odd. You can look, it's right there in the legislative history of 1977. Congress planned this, enacted this as a State implemented program. And they talked about the permitting process, and we've got that in the Joint Appendix. And they described this as a process that States may review on a case-by-case basis to decide whether to grant or deny permits. So, yes, there are many other provisions of the statute in which things are automatically centralized. This is not one of them. But I wouldn't say that that's odd. It's consistent with what Congress intended. To be clear, though, writing this guidance did not authorize in any particular case a decision to grant or deny the permit. I mean, the permitting authority has the same burden. It cannot simply cite the fact that the guidance was issued and stop its decision-making there. Also, I know counsel noted in his remarks that the statute does not give EPA authority to grant permits based on de minimis authority or decision-making authority, de minimis exemptions. To be clear, this particular guidance didn't rely on that principle. The 2010 rule did rely on that principle. EPA hasn't disclaimed it here, but it's not the basis on which it's offering a recommendation. That basis, of course, we've explained in our brief. It's based on its construction of the terms cause or contribute. Kennedy. Just to be, I just want to nail this down. So when you use the word significant, in this case, you do not mean de minimis. You do not mean some small amount. You mean an amount that you can't statistically tell whether it will affect the design or not. That is correct. Is that right? And I do believe Your Honor understood earlier what EPA was explaining in the joint appendix. And I would refer particularly to the discussion in pages 47 to 51 of the joint appendix. EPA talked about statistical analysis, the concept of what's statistically significant or not. It explained what's known as the null hypothesis, the idea that if a value is not statistically significant from the sample you're comparing it to, then you cannot know with confidence that there's any actual difference or any actual effect. So how is that possible if the design value is an arithmetic mean and you don't dispute that emissions are actually occurring? This is all in the situation. Well, emissions are projected to occur, yes, because, of course, we're talking here about actual observed. We're talking about sources that haven't been built yet. But you're authorizing the building of a source that will make an emission, which you are modeling somehow or other. Correct. Right? Okay. So how can that not affect the design value? I understand how it might not affect the variability of wind in a certain time, but I don't understand how it can't affect the air. If you add even a tiny amount, you affect the air. One way that that's perhaps easier to understand is, okay, so SILs, these SILs can be used both in the initial single-source analysis, which has largely been the focus of our briefs. You take the SIL and you compare that. You take the SIL, by the way, using worst-case assumptions about what the model then has. I think that either I'm having a problem today or the microphone. I'm hoping it's the microphone. Sure. There's two different analyses in which you can use a SIL, single-source and cumulative. Much of our dispute here focuses on that first one because that screens out projects when you, you know, if you're going to follow these recommendations and you model the impact of the source using a worst-case estimate of what the emissions will be, and then you compare that to the value, and if it's less than the value, you're concluding, you know, it's not significant, as you've said. But let's say there were a scenario where the source's proposed impact, modeled impact, is higher than the SIL. You would then, you then could use the SIL as part of cumulative analysis, and I think that second stage helps answer your question, because when you do cumulative analysis, you are then looking at nearby sources, you're looking at background, and you're trying to coincide with the point in time and the place where violation is going to occur. And this is important. When we talk about the variability in emissions, there are multiple model locations throughout this area, whatever the area of concern is. There's obviously a time element. The design value is measured over a period of years, not just one day. And so, yes, if the source constructs and operates, it's going to add something to the atmosphere. No one can deny that. But that doesn't mean it's going to have an impact at the point in time where it would lead to violation, because it's the particular high variability day or the low variability day. I thought the share club was talking about a different type of cumulative impact, that if there are 15 permit applications pending simultaneously, and each one is below the first come, first served, that eventually you're going to get to a point where, together, they have a significant impact. Well, I mean, EPA's guidance does not prevent a permitting authority, and in fact notes and makes clear to permitting authorities that they still have the obligation on a case-by-case basis to look at information like that. So certainly... I thought it gave them the option, not... It gives them the option, but it doesn't... that you are excused from examining relevant information in the record just because the guidance was written. And certainly, EPA is clear that one thing that may be relevant is, are there other sources that are proposed as well or that are adjacent to... I guess I'm not the proposed source. Understanding the guidance well, then, you're saying that this still analysis applies only if there's only a single source being built, and otherwise the states can't use it or shouldn't use it? No, I wouldn't say that. But the way EPA put it in the guidance is, this approach and these values should be sufficient in most cases. They didn't say, will be sufficient in all cases. They said, should be sufficient in most cases. But it didn't say in which cases it wouldn't be sufficient. It did not attempt to be prescriptive and to say precisely when a permitting authority should depart either. And it didn't say what the case-by-case analysis you're talking about is in the way that you're I'm sorry, Your Honor. It also didn't say, it mentioned a case-by-case analysis, but it didn't say what that meant. It wasn't prescriptive, no. Not only wasn't it prescriptive, it wasn't descriptive. It didn't say anything like what you just said, that you still have to do a case-by-case analysis. Well, no, it did say that. I think it didn't attempt to draw out what each conclusion is going to be under each scenario that you might encounter, but it certainly did. And I'll refer you to, for example, at pages 20 and 21 of the Joint Appendix, the case-by-case use of seal value should be justified in the record for each permit to ensure an adequate record. Any decision should incorporate the information in the technical documents, but should consider any additional information in the record that's relevant to making the required demonstration. Yeah, so I don't understand what that meant, since EPA is saying the seal is okay. What additional record evidence could there be? And I'll get, and again, Joint Appendix 4, EPA believes the application of these seals in the manner described below would be sufficient in most situations for a permanent authority to conclude that a proposed source will not cause or contribute to a violation of an Ozone or PM 2.5 max, or PM 2.5 influence. It does not, and, you know, a determination that a proposed source does not cause or contribute can only be made on a permit-specific basis after consideration of the permit record. If there's evidence in the record for a particular application that there are other sources that may also have, add to emissions locally, clearly that's something that would be relevant. What does it mean on JA-19 where it says, where the preliminary analysis described in the prior paragraph shows a significant impact, that's where it shows, permitting authorities may choose to use the recommended seal values in a cumulative impact analysis. What does the main mean there? Historically, for many years, earlier significant impact values have been used at a single source stage to initially screen out. Used by who? Used by PSC applicants. To be clear, the process hasn't changed. Where you would use this and how hasn't changed. So the only thing that's new here is just the way that EPA articulated its recommended legal rationale and the statistical foundation. But the basic approach of using a significant impact level of some type for a single source analysis and for cumulative, that's not a new thing. Previous SILs would include, for example, those that are still in existence under the 2000 Act. But the previous SILs were not, the word S in SIL did not mean statistically insignificant. This is the first instance in which specifically EPA used an approach based on statistical insignificance. If you could help me with this. So how does the SIL apply in a circumstance where you're close to the increment already? You're close to the NAC and the implement already. Are you saying that? I think it would work in the same way initially. Because the point of the analysis and, you know, what EPA is suggesting is that you're learning something about whether this source can be said to cause or contribute to anything. So, you know, and that conclusion may hold whether the background air quality concentrations are lower or higher. Because the question you're trying to answer isn't what's the quality of the air in this area. The question you're trying to answer is what is this source doing? What is it going to cause or contribute? The terms imply some causality. So this is an attempt using the concept of, you know, data that's statistically insignificant. What is EPA's position if there are 10 new construction projects proposed? I don't think this guidance does not give, you know, a concrete and binding answer as to what you do when there are 10. It does leave it to the permitting authority to make a decision to look at what information is available on the record. Is it a recommendation that the CIL, if it doesn't meet the CIL, that would be sufficient? I don't think we can say because EPA has recommended an approach while making clear that there may be case-by-case circumstances. You know, you keep saying case-by-case. Every time I hear that case-by-case, I think, well, you know, what does that mean? It means you're not telling us what the standard is. And, of course, we decide each case by case by case. But the question is not what the inclination is. The question is what standards apply. What standards apply when the situation is as Chief Judge Garland just described it? What are the standards? How do you determine whether to use a CIL or not? Well, and again, I think you can, the question isn't only, you can use a CIL and you can still also consider other information in the record. And if it's in the record, you have to consider it if it's relevant. So I don't know that it's an either or. A permitting authority may use these CILs, but when there are permit applications in which there's evidence of the type you're talking about, such as a large number of other geographically proximate sources, if that's the right word, they may be looking at that as well and making a decision whether, in that case, it still makes sense to grant the permits only based on finding out. How accurate, how predictive have these models been? The models are used for multiple air regulatory programs, not just this one. And this particular analysis, the statistical analysis, was peer-reviewed here, and EPA responded to the peer-reviewed comments and made adjustments as appropriate. Are they perfect? I don't think I could ever say that. You said what? I don't think I could ever say that any model is perfect, so there's always going to be some degree of uncertainty. Some are better than others. Right. And, of course, one of the things the PSD statutory provisions do is require EPA every three years to convene reviews of its modeling with the public, so there is an ongoing process of improving and refining them as we go. Many years ago, it wasn't possible to model the precursor emissions to PM2.5 and ozone. Now it is. Okay. How is the – I take it that this is all done based on analysis of national ambient air quality, correct? That's correct. And how is that consistent with E1 and E2? E1 and E2, which talk about the – at the proposed site. The source still has the – the proposed source still has to collect ambient air quality monitoring data, and that doesn't change based on this guidance. So in that sense, there is – you are looking at local atmospheric conditions as well. But the modeling doesn't have to be done using the source at the site? Because apparently that's not what you're doing. You're using a national SIL, right? The SIL value was determined using – looking at air quality variability nationwide, but a proposed PSD source applying for a permit is going to have to gather air quality monitoring information locally.  Further questions? Thank you, Your Honors. I assume there's no remaining time. You can take two minutes. Thank you, Your Honor. I'll try to be very brief. First, with respect to the question Your Honor was just asking about 7475E, I'd refer Your Honor to the Sierra Club case from 2013. That – it explains that that monitoring must be done for purposes of the analysis under 7475A. If I understand EPA's position now, it's that sources still have to do that monitoring, but they can still conclude, completely ignoring that monitoring, that a source won't cause or contribute to a violation. Which gets me to my next point, which is that when EPA says that SILs suffice in most cases, I read that as a concession that they don't actually show there won't be a cause or a contribution from the source. This really isn't an issue of statistical significance. What they've done is they've imported the variability approach from that body of statistics, but we know from the modeling that these sources will cause or contribute, and it's just that cause or contribution will just add to whatever variability is going on already in the region. It's just more cause to be concerned. There's really no question. If instead of Sierra Club, the states had brought an action here complaining about the guidance document, what would the legal analysis be of whether it was final or not? It would be the same, Your Honor. Well, I wonder about that. Isn't the answer to the states, what are you complaining about? You're not required to follow this. So there's no case for controversy here. Well, actually, Your Honor, that's not quite right, because a lot of this pollution travels, and so you might have one state that recognizes this problem would lead to violations, and a neighboring state could use SILs, authorize permits that actually cause or contribute to violations in the plaintiff's state. So I agree it's an issue here for us. Are you talking about the ozone transport region? Well, ozone does travel, yes, Your Honor, and so does PM. But I agree with Your Honor that it is even more concerning for us as plaintiffs, because as regulatory beneficiaries here, we have even less say in this process, and both EPA and states are authorizing permits under this guidance, which emit pollution that harms our members. Well, the states have a very distinct interest, because if they get in violation and all kinds of restrictions begin to apply to them that would not otherwise apply. That's right, Your Honor, but I believe that's just a separate issue. The interveners made a point about how there's these incentives for states to use their SIP to worry about these violations, and the Sierra Club case from 2013 forecloses that, as does the Alabama Power case, which hold very clearly that this pre-construction permitting program under 7475A3 is the central mechanism in the act to prevent and avoid violations of the standards. Thank you, Your Honors. Can you just say, I'm sorry, I'm still not completely following the government's response with respect to what happens if the SIL is near the increment or if it's used up some of the increment. Sure. That issue and the cumulative effect either with respect to existing construction or new construction. I would refer, Your Honor, to J.A. 11, where EPA says that EPA's intention with this new method was to derive SIL values that are more universally applicable to a range of conditions, including those where a substantial portion of the NAAQS or PSD increment is known to be consumed. And as Your Honor pointed out, there is no safety valve in here for when on this case-by-case approach. I'm sorry. J.A. 11? Yes. In the second paragraph under analytical foundation. It's the second to last sentence in that paragraph, Your Honor. Got it. Thank you. Go ahead. I would also refer, Your Honor, to EPA's legal memorandum, because the real issue in this case is that EPA's legal approach determines that permitting authorities can deem a source not to cause or contribute to a violation even when it does. That is the crux of it, is that they can now, under this culpability analysis, grant a permit even though a source causes a violation, is the but-for cause of a violation. And whether or not they have some loose discretion to, you know, on a whim not do that, this guidance authorizes them to grant those permits unequivocally. That is unlawful. Thank you. We'll take the matter under submission. Appreciate it. Thank you.
judges: Garland, Wilkins, Randolph